**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**Case No.: 21-22433-CIV-MARTINEZ-BECERRA**

FLOR MORERA LOPEZ, and
ASBERT ANAZCO, individually and
as personal representatives of the
Estate of Asbert E. Anazco,

Plaintiffs,

v.

ZOLL SERVICES, LLC,
ZOLL MEDICAL CORP., and
ZOLL MANUFACTURING CORP.

Defendants.
_________________________________/

**ZOLL'S MOTION AND INCORPORATED MEMORANDUM OF LAW TO EXCLUDE PLAINTIFFS' EXPERTS GEORGE YANULIS AND RISHI ANAND, M.D.**

Plaintiffs' experts George Yanulis and Dr. Rishi Anand offer only unreliable, unsupported, and unhelpful opinions. Both experts concede many of the factual flaws underlying their opinions, as well as failures in following their own methodology. Pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), ZOLL moves to exclude them from offering their unreliable and unqualified opinions.

***George Yanulis***

*First*, despite being Plaintiffs' designated engineer expert, Yanulis cannot identify any component in the LifeVest® that deviated from its FDA-approved specifications, and further, he failed to test for such claims. To avoid preemption of their manufacturing defect claims, Plaintiffs must show that Asbert Anazco's ("Anazco") LifeVest deviated in some way from its FDA-approved design. But Yanulis conceded during his deposition that he cannot say how the device supposedly deviated. His *ipse dixit* opinion that the device was somehow defective is thus entirely speculative, lacking methodology, and unhelpful to the trier of fact, and therefore, inadmissible.

*Second*, Yanulis's opinion that the LifeVest must have had a manufacturing defect because it did not treat is unreliable because it is based on an indisputably incorrect assumption—that at the point when the LifeVest deploys its blue gel, it has reached the threshold necessary to, and thus will, deliver a treatment shock when operating in accordance with its FDA-approved design. As explained by ZOLL's engineer and other evidence cited by ZOLL—which has not been refuted—the threshold for delivering a treatment shock is *not* necessarily met when the device deploys the blue gel, and if the threshold for treatment is not met *after* gel deployment, the device is designed to abort treatment. Ultimately, Yanulis conceded during his deposition that the device does not necessarily deliver a treatment shock after the gel is deployed and that he cannot rule out that the device canceled treatment because it detected a non-treatable rhythm. In short, Yanulis fails to rule out that the device did not shock because it was operating in accordance with its FDA-approved design, as opposed to because of some unidentified manufacturing defect. Thus, his key opinion in this case lacks a reliable foundation, among other flaws, and should be excluded.

*Third*, Yanulis's implication that the SD card and SD card faults were somehow related to an unknown defect that caused the device to not deliver a treatment shock is completely

nonsensical and unreliable given his own admissions. Indeed, during his deposition, Yanulis conceded the SD card has nothing to do with the LifeVest's ability to deliver a treatment shock. And he further conceded that the dislodgment of the SD card—which was the reason for the SD card fault flag—was not due to any manufacturing or refurbishment defect. In other words, by his own admissions, there is no basis for some opinion that the SD card faults are evidence of or were related to a defect that caused the device not to deliver treatment. Yanulis's discussion of SD card faults and related abnormal shutdowns is a red herring irrelevant to the issues in this case.

*Fourth*, Yanulis's regulatory opinions should be excluded for myriad reasons. He admitted he is not an FDA regulatory expert and therefore lacks the qualifications to make them. Moreover, he is unable to connect his opinions regarding so-called regulatory issues to the LifeVest at issue or otherwise to the facts of this case.

In sum, each of Yanulis's opinions are subject to exclusion as they lack methodology, are based on unreliable *ipse dixit* assumptions about facts or data, and are not helpful to the trier of fact. They fail to meet the rigorous criteria for admissibility and should be excluded entirely.

***Dr. Rishi Anand***

*First*, Dr. Anand seeks to opine that Mr. Anazco was in ventricular fibrillation (VF) and that this was the most likely cause of his death. Dr. Anand, however, admitted that he could not rule out several other alternative causes that he acknowledged could have resulted in Anazco's death. Not doing so is indicative of his failure to follow the typical methodology he would employ in his practice as a physician, or any reliable methodology for that matter. His failure to employ a reliable methodology is a classic hallmark of an unreliable opinion and thus is a well-recognized ground for exclusion.

*Second*, Dr. Anand offers opinions which rely on his own unqualified interpretation of ZOLL's documents and of the LifeVest's technical specifications. For example, Dr. Anand relies on the flag report for his opinion that Anazco was in VF; but Dr. Anand lacks the experience and engineering background to interpret the flag report. Further, although he concedes ZOLL's engineers know more about the LifeVest algorithm and its confidence intervals than him, Dr. Anand offers opinions based on a demonstrably incorrect understanding of how the device operates

that is at odds with the explanations of ZOLL's engineers. His opinions are unreliable and inadmissible, as they rest on unqualified assumptions and inadequate factual foundations.

*Third*, despite being retained nearly three months before the initial expert disclosure deadline, being disclosed for the first time on rebuttal, and Plaintiffs alleging a *manufacturing* claim, at deposition Dr. Anand offered what is essentially a new opinion about the *design* of the LifeVest's software algorithm. Dr. Anand is not an engineer and is not qualified to opine on the LifeVest's design. But more importantly, this opinion is at odds with the FDA-approved design of the LifeVest, and is therefore preempted. His opinions in this regard, then, are not relevant because they do not fit the claims here.

## BACKGROUND

### A. The LifeVest.

On May 27, 2020, Anazco's doctor prescribed him a ZOLL LifeVest.[1] The LifeVest is an FDA pre-market approved ("PMA") Class III device, first approved in 2001. Since then, the FDA has approved numerous PMA supplements for the LifeVest. The original and supplemental PMA approvals remain in effect, under the FDA's continuing oversight and regulation, and have never been suspended or revoked.[2] The LifeVest is a wearable cardiac defibrillator that continuously monitors the wearer's heart rate and rhythm to detect and, when appropriate, treat certain rapid ventricular arrythmias (VT and VF).[3] If the LifeVest receives inputs that are consistent with a treatable arrythmia, it will "declare" an arrythmia and then go through a verification period to confirm that the declared rhythm is in fact a sustained rhythm that should be treated.[4] During this verification period (treatment sequence), the device starts the treatment sequence by issuing alarms, beginning with a tactile vibration followed by audible voice alerts.[5] If the device reaches a certain threshold (72% confidence), it will disperse a conductive blue gel meant to aid in the

[1] ZOLL_ANA000001, Ex. 1.
[2] Decl. of Eugene Partin (Partin Decl.) at ¶ 6, Ex. 2.
[3] A more detailed discussion of how the LifeVest works and how it functioned on the day in question is contained in the Declaration of Shane Volpe, which is attached to this motion as Ex. 3.
[4] *See, e.g.*, Decl. of Shane Volpe (Volpe Decl.) at ¶¶ 7–8, 10, 21, 23–25, Ex. 3.
[5] *Id.* ¶ 25.

conduction of the current to the skin if a shock is ultimately delivered.[6] After the gel is dispersed, the device continues to monitor the patient's heartbeat and other data, and if the threshold for delivering a treatment shock is met (100% confidence), the LifeVest will discharge a treatment shock;[7] however, if the device does *not* reach 100% confidence or the response buttons are pressed, the device will *not* deliver a shock even *after* the gel is dispersed.[8]

Due to the presence of noise, among other variables, the device's FDA-approved design accommodates for the possibility that the LifeVest may falsely declare a treatable arrhythmia and begin the treatment sequence.[9] To delay a potentially imminent treatment, the user can press response buttons to terminate or delay treatment.[10] Even if the response buttons are not pressed by the patient, the LifeVest may delay treatment after beginning the treatment sequence if the necessary 100% confidence threshold is not reached, and it will terminate the treatment sequence if the confidence falls and the device declares a "non-treatable rhythm."[11]

The LifeVest includes the presence of a SD card—secure digital memory card—within a slot behind the monitor's battery. The SD card is used for patient-specific data storage, not for the therapeutic functionality of the device. As such, the LifeVest by design executes its detect and treat functionality without the SD card. Likewise, the device itself stores certain data about certain functions that it executes based on inputs—known as "flags—even without the SD card present.[12]

**B. The events of July 8, 2020**.

A little after 4:00 a.m. on July 8, 2020, Plaintiffs called 911 requesting an ambulance because Mr. Anazco was "not breathing."[13] Although the LifeVest alarmed and dispensed blue gel, it never reached 100% confidence and never delivered a treatment shock to Anazco.[14] Data

[6] *Id.* ¶ 28.
[7] *Id.* ¶¶ 26, 28–29.
[8] *Id.* ¶ 26.
[9] *Id.* ¶ 27.
[10] *Id.*
[11] *Id.* ¶ 26.
[12] *Id.* ¶ 11.
[13] *See* 911 Transcript, Ex. 4; Exhibit 14 to Arora Deposition, Ex. 5.
[14] Volpe Decl. ¶¶ 40, 46; *also id.* ¶¶ 37–46 (describing evaluation of data for entire event).

from the device shows that following the gel release, the confidence began to drop, and 59 seconds later, when it reached zero, the device deactivated the high voltage converter.[15] On several occasions after Plaintiffs called 911, the LifeVest detected asystole, which is known as "flatline" and is not treatable by the LifeVest.[16] When EMS arrived around 4:30 a.m., Anazco was pronounced dead on arrival.[17]

**C. The subject LifeVest testing.**

On January 7, 2022, Yanulis and others attended an inspection of Anazco's LifeVest at ZOLL's headquarters during which both the monitor and belt were tested.[18] Both passed inspection, successfully performing detect-and-treat functions according to their FDA-approved design.[19] Of note, the label covering the SD card slot was peeled back, which allowed the SD card to be slightly dislodged from the unit, but did not impact detect-and-treat, since the SD card has no role in the detect-and-treat function of the device.[20]

**D. Yanulis's opinions.**

Yanulis was "retained to evaluate the performance of the LifeVest" used by Anazco.[21] He offers four opinions: First, the "LifeVest should have—but did not—deliver a treatment shock" during the morning of July 8, 2020. The next two opinions purport to explain why—the "LifeVest did not deliver a treatment shock due to a capacitor discharge failure," which "was most likely the result of a microprocessor communication fault." Finally, Yanulis opines that ZOLL could have avoided this alleged "failure" by implementing "requirements of pertinent FDA regulations."[22] Yanulis has no opinions on medical causation, i.e., whether a LifeVest treatment would have prevented Anazco's death, or whether Anazco had a treatable rhythm on July 8.[23]

---

[15] *Id.* ¶¶ 42–43.
[16] *Id.* ¶¶ 38–40, 44–45.
[17] Dep. of First Responder Darwin Villavicencio 26:3–5, Ex. 6.
[18] *E.g.*, Dep. of George Yanulis (Yanulis Dep.) at 166:20–167:1, Ex. 7; Volpe Decl. ¶ 47.
[19] Volpe Decl. ¶ 47.
[20] *Id.* ¶¶ 11, 48; *also* Yanulis Dep. 168:2–17.
[21] Initial Report of George Yanulis (Yanulis Rep.) at pp. 1, 3, Ex. 8.
[22] Yanulis Rep. 3–4.
[23] Yanulis Dep. 62:5–12, 124:24–125:3.

**E. Dr. Anand's opinions.**

Dr. Anand is a licensed physician with experience treating cases of sudden cardiac arrests, and he has prescribed the LifeVest.[24] He based his opinions on his "education, knowledge, experience, training and skill in treating and evaluating patients with conditions similar to Mr. Anazco," as well as his consideration of "the facts and data in the records/references set forth in [his] report."[25] Dr. Anand opines that "the most likely cause of Mr. Anazco's death was ventricular fibrillation, and not the possible causes" identified by ZOLL's expert, Patrick J. Blomberg, MD, MBA, FACC, FHRS.[26] Dr. Anand contends that, from his understanding, because the LifeVest a) detects VF with 100% specificity, b) "clearly" detected VF with 100% confidence at 04:20:12, and c) deployed the gel, which means it's "go time," he can make a clinical assessment that Anazco in fact had a treatable VF rhythm.[27] He also opines that the LifeVest was a contributing factor in Anazco's death because it detected VF, deployed its gel, but didn't deliver a treatment shock.[28]

**LEGAL STANDARD**

In evaluating admissibility of expert opinion testimony, *Daubert* and Fed. R. Evid. 702 charge district courts with the "gatekeeping" responsibility of ensuring that "speculative and unreliable opinions do not reach the jury."[29] This gatekeeping obligation "inherently requires the trial court to conduct an exacting analysis of the *foundations* of the expert opinions to ensure they meet the standards for admissibility under Rule 702."[30] In carrying out this rigorous "expert admissibility inquiry," and before deeming expert testimony admissible, the 11th Circuit has instructed that the trial court must find:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific,

[24] Report of Rishi Anand (Anand Rep.) at p. 1, Ex. 9.
[25] *Id.* at 2.
[26] *Id.* at 5.
[27] *Id.* at 4; Dep. of Rishi Anand (Anand Dep.) at 155:20–156:1, 167:8–168:12, Ex. 10.
[28] Anand Rep. 4.
[29] *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).
[30] *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

> technical, or specialized expertise, to understand the evidence or to determine a fact in issue.[31]

Although these requirements—qualification, reliability, and helpfulness—may overlap, "they remain distinct concepts and the courts must take care not to conflate them."[32] For example, although the expert's qualifications "may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. By the same token, a reliable opinion expressed by a genuinely qualified expert may not help the jury if it does not pertain to a fact at issue in the case."[33]

Turning to the requirements themselves, Rule 702 sets forth the "various ways" in which an expert may be "qualified," i.e., "knowledge, skill, experience, training, or education."[34] That said, "the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable *any* conceivable opinion the expert may express."[35] As to reliability, "[w]hether an expert's testimony is reliable depends on 'the particular facts and circumstances of the particular case.'"[36] In making this evaluation, the court can consider several factors, including those set forth in *Daubert*.[37] But, "in order for a methodology to be reliable, the expert must be able to adequately explain *how* the data he relied on led him to his conclusions."[38] In short, when it comes to reliability, the trial court assesses whether the means by which the expert reached his opinions is "supported by appropriate validation—i.e., good grounds, based on what is known."[39] As for relevance, also referred to as the "fit" requirement, "the court must ensure that the proposed expert testimony is relevant to the task at hand, i.e., that it logically advances a material aspect of the proposing party's case."[40] "The

---

[31] *MidAmerica C2L Inc. v. Siemens Energy Inc.*, 25 F.4th 1312, 1326 (11th Cir. 2022); *also Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005).
[32] *Frazier*, 387 F.3d at 1260.
[33] *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340–42 (11th Cir. 2003).
[34] Fed. R. Evid. 702; *Frazier*, 387 F.3d at 1260–61.
[35] *Frazier*, 387 F.3d at 1261.
[36] *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999)).
[37] *Rink*, 400 F.3d at 1292.
[38] *MidAmerica C2L*, 25 F.4th at 1328 (emphasis added).
[39] *Frazier*, 387 F.3d at 1261 (quoting *Daubert*, 509 U.S. at 590).
[40] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

basic standard of relevance is a liberal one, but if an expert opinion does not have a valid scientific connection to the pertinent inquiry, it should be excluded because there is no fit."[41]

Ultimately, the proponent of an expert's opinion bears the burden of proving its admissibility.[42] And if the proffered expert opinion does not bear these hallmarks of reliability and relevance, then it is not admissible through any means.[43] Further, the 11th Circuit has held that an abdication of this gatekeeping role is an abuse of discretion.[44] Overall, then, the trial court's role "is especially significant since the expert's opinion 'can be both powerful and quite misleading because of the difficulty in evaluating it,'" and the "importance of *Daubert*'s gatekeeping requirement cannot be overstated."[45]

## ARGUMENT

***George Yanulis***

**I. Yanulis cannot identify any component in the LifeVest that deviated from the FDA-approved design; thus, his opinions should be excluded as lacking methodology, unreliable, and entirely unhelpful to the trier of fact.**

To overcome preemption, Plaintiffs must prove that the LifeVest did not conform to its FDA-approved design specifications.[46] But while plaintiffs designated Yanulis to support their manufacturing defect claim, his opinions and testimony are entirely unhelpful to that issue because he cannot explain how or in what way the LifeVest supposedly deviated from its approved design.

Indeed, nowhere in his initial report or rebuttal report does Yanulis explain in what way the LifeVest supposedly deviated from the design the FDA approved.[47] And during his deposition he was asked multiple times what component in the LifeVest allegedly failed, and multiple times

---

[41] *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016).
[42] *Rink*, 400 F.3d at 1292.
[43] *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) ("The court must do 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' *Daubert*, 509 U.S. at 593–94.").
[44] *McClain*, 401 F.3d at 1238.
[45] *Frazier*, 387 F.3d at 1260 (quoting *Daubert*, 509 U.S. at 595).
[46] *See* ZOLL's Mot. for Summ. J. (filed concurrently herewith).
[47] *See generally* Yanulis Rep.; Rebuttal Report of George Yanulis (Yanulis Rebuttal Rep.), Ex. 11.

he testified that *he did not know*.[48] Additionally, while it is his opinion there was some intermittent communication fault that occurred and prevented treatment, he cannot identify any component that would support his theory of an intermittent communication fault:

> Q. Okay. But what component do you believe failed and how, causing an intermittent communication interruption between the ARM and the DSP?
>
> A. I don't know the exact component, but there was some communication failure.[49]

Further, while Yanulis is critical of ZOLL's manufacturing and refurbishing practices and procedures, he admitted there is nothing in his report explaining how any specific component of the LifeVest would have been manufactured or refurbished differently if ZOLL had implemented different policies or procedures.[50]

Yanulis's inability to identify a defective component is unsurprising given that his admissions reveal he does not understand how the LifeVest and its various components work and he failed to utilize accepted methodology (i.e., inspection) to identify any defect. For example, he testified that he does not understand how the ARM works and would need to examine it, which he did not do in this case despite the opportunity:

> Q. What I'm asking you is where in your report do you describe what component failed in this device, causing an interruption between the ARM and the DSP? Why did it fail?
>
> A. Again, I'm basing it on the miscommunication of the ARM – between the ARM and the DSP. Again, I don't know the exact components. I haven't looked at the architecture for an ARM itself.
>
> . . . .
>
> A. So I don't know.
>
> . . . .
>
> A. But if I – was to examine it, I could probably find it.
>
> Q. Did you ask to examine it?
>
> A. No, I did not.

---

[48] Yanulis Dep. 163:4–164:21.
[49] *Id.* at 163:16–21.
[50] *Id.* at 196:12–197:20.

Yanulis would admit that his opinion should be excluded for this reason, as he testified that if he does not completely understand how a product functions, he cannot scientifically evaluate it and any potential problems.[51]

In sum, Yanulis's opinion that there must be some manufacturing defect here is nothing more than inadmissible *ipse dixit* that does nothing to support Plaintiffs' theory that the device as manufactured did not conform with its FDA-approved specifications.[52] Because his testimony is speculative and would be unhelpful to the trier of fact, it should be precluded.

**II. Yanulis's opinions are all predicated on a demonstrably incorrect factual assumption, rendering his opinions unreliable and leaving him unable to rule out that Anazco's device actually performed in accordance with its FDA-approved design.**

The Supreme Court in *Joiner* "made it clear that although principles and methodology were the focus, the court was not precluded from looking at conclusions."[53] Relatedly, from the plain language of Rule 702, it is axiomatic that an expert's opinion must rest on an adequate factual foundation.[54] In other words, if the expert's conclusion is based on factual assumptions that are plainly incorrect, then his opinions are not reliable and thus are inadmissible. Such is the case here.

Yanulis's opinion that the LifeVest failed to deliver treatment due to a capacitor discharge failure is inherently unreliable because it is based on an indisputably incorrect assumption—that at the point when the LifeVest deploys its blue gel, it has always reached the threshold necessary to, and will, deliver a treatment shock when operating in accordance with its FDA-approved

[51] *Id.* at 164:10–165:3.
[52] *Hendrix ex rel. G.P. v. Evenflo Co.,* 609 F.3d 1183, 1201 (11th Cir. 2010) (citing *McClain* and *Joiner*) ("[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.")
[53] *Allison*, 184 F.3d at 1315 (citing *Joiner*).
[54] Fed. R. Evid. 702(b); *see also, e.g.*, *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 566–67 (11th Cir. 1998) (affirming exclusion of statistician's opinions that relied on "fundamentally flawed" underlying data, i.e., sales data from Florida when the suit only alleged a conspiracy in Alabama, as "consequently unreliable"); *McSwain v. World Fuel Servs. Corp.*, 546 F. Supp. 3d 1144, 1151 (S.D. Fla. 2021) (explaining that the "critical point is whether" the expert's "assumptions rest on a sufficient factual basis, adequately supported by the evidence").

design.[55] Based on this incorrect assumption, he opines that something must have gone wrong with Anazco's LifeVest because it deployed its blue gel but did not deliver a treatment shock.[56]

Yet, it is not the case that when the LifeVest deploys its blue gel, it has always reached the threshold necessary to, and will, deliver a treatment shock when operating in accordance with its FDA-approved design. By design, the LifeVest deploys the gel when it reaches 72% confidence, i.e., at level *below* the 100% confidence necessary to shock a treatable rhythm; and if the threshold for treatment is not met *after* gel deployment and the device detects a non-treatable rhythm, it will abort treatment.[57] That is precisely what happened here. The confidence reached the threshold necessary for *gel deployment* (72%), but never reached the threshold necessary for *treatment* (100%); instead, after gel deployment the confidence continued to go down, eventually to zero, and the LifeVest deactivated the high voltage converter.[58]

Yanulis offers nothing to explain[59] that the device—when operating in accordance with its FDA-approved design—operates differently or operated differently on the day in question than the evidence establishes. To the contrary, Yanulis made multiple concessions at his deposition that are inconsistent with the conclusion in his report that gel delivery indicates the device reached the necessary threshold to deliver treatment. For starters, he admitted he had no documentary or evidentiary support for his assumption that gel deployment means that the device has reached the 100% confidence threshold to deliver a treatment shock.[60] He also acknowledged he considered and read Shane Volpe's deposition and he did not disagree with how Volpe described the confidence levels before gel delivery and how the LifeVest works generally (which is consistent with ZOLL's description above).[61] Further, he admitted the device is designed to treat only once

---

[55] *E.g.*, Yanulis Rep. 5; Volpe Decl. ¶ 28.
[56] *E.g.*, Yanulis Rep. 3–6.
[57] Volpe Decl. ¶¶ 28–29.
[58] *Id.* ¶¶ 40–43, 46.
[59] An expert must be able to explain himself. *See, e.g.*, *MidAmerica C2L*, 25 F.4th at 1328 (stating that 11th Circuit "caselaw makes clear that, in order for a methodology to be reliable, the expert must be able to adequately explain how the data he relied on led him to his conclusions" and noting that "caselaw on this point is legion").
[60] Yanulis Dep. 131:7–16.
[61] *Id.* at 106:12–22.

it reaches 100% confidence the second time.[62] Beyond this, he conceded the device detected a non-treatable rhythm after declaring VF, *and he could not rule out that it exited the treatment phase because it detected a non-treatable rhythm*.[63]

In other words, Yanulis ultimately concedes he cannot rule out that the LifeVest did not shock Anazco because it never met the necessary threshold required for treatment in accordance with its FDA-approved design, as opposed to because of some unidentified manufacturing defect. Nor did Yanulis seek any further testing of the device which passed its detect and treat functions at inspection on January 7, 2022. Yanulis's initial faulty factual premise and lack of supporting basis for his false assumption, combined with his concessions and inability to rule out that the device operated as designed, render his opinions entirely unreliable and therefore, inadmissible.

**III. Yanulis concedes his opinions regarding SD card faults are entirely irrelevant and unreliable red herrings that do not fit the facts of the case.**

In his report, Yanulis implies that—but notably, never explains how—SD card faults are somehow related to his defect opinions and the fact that the device did not deliver a treatment to Anazco. Whatever his opinion is, it is unreliable and flawed given that he conceded the SD card could not have had anything to do with the ability of the LifeVest to deliver a treatment shock:

> Q. So the things you said in your report about the SD card, you'll agree with me that the SD card has nothing to do with the detect-and-treat sequence and the primary functionality of the device to deliver a treatment shock?
>
> A. I will agree with that.[64]

Moreover, Yanulis conceded that the reason the SD card on Anazco's device was not functional at the time of the event was because the SD card was dislodged due to a peeling label, which he does *not* attribute to ZOLL or any kind of manufacturing or refurbishing defect:

> Q. Okay. And the reason that it was partially dislodged is because the label and the padding over the SD card was no longer firmly affixed inside the battery compartment; is that correct?
>
> A. Correct.

---

[62] *Id.* at 105:24–107:10, 113:2–8.
[63] *Id.* at 144:8–146:7, 152:14–153:1.
[64] *Id.* at 166:1–6.

Q. Okay. And you have no opinion as to whether or not the SD card label and padding was in place at the time the product left Zoll; correct?

A. Correct.

Q. Okay. Do you know the procedure for affixing the padding and labeling?

A. It follows the FDA protocols for labeling.

Q. And you have no opinion that that procedure wasn't followed correctly with respect to the manufacture or later refurbishment of the device specifically as to the SD card; correct?

A. Correct.[65]

In short, Yanulis agreed that the LifeVest was experiencing SD card faults for a reason unrelated to a manufacturing or refurbishing defect[66] and that regardless, the SD card faults had nothing to do with the fact that the LifeVest did not deliver a treatment to Anazco.[67] Thus, any opinion by Yanulis that SD card itself or SD card faults are somehow related to a supposed manufacturing or refurbishing defect that caused the device to not deliver a treatment shock to Anazco is nonsensical, unreliable, and, by his own admissions, based on inaccurate data.

**IV. Yanulis's regulatory opinions are inadmissible for multiple reasons including because he is not an FDA regulatory expert and his opinions are entirely irrelevant to the issues in this case.**

Yanulis's final opinion is that because ZOLL knew of abnormal shutdowns related to SD card issues and because it did not conduct a root-cause investigation of the monitor in July 2019 when the monitor could not complete its "detect-and-treat" function on an FDA-approved automated test, ZOLL failed to follow some unidentified FDA regulations. This opinion is inadmissible.

First, while Yanulis opines that ZOLL failed to implement required FDA regulations, he is admittedly not an FDA regulatory expert:

Q. And you're not an FDA expert; correct?

---

[65] *Id.* at 168:12–169:5.

[66] *Id.* at 166:20–169:5; *also id.* at 75:22–76:3 ("Q. If a device fails because of wear and tear, to the extent that is a lawsuit, you would be opining it's because the design of that element of the device wasn't robust enough to withstand the wear and tear; is that right? A. I'd agree with that; yes ma'am.")

[67] *Id.* at 166:1–6.

A. Correct.

Q. And that includes not being an expert what it takes to comply with FDA regulations; correct?

A. Correct. …[68]

In other words, Yanulis lacks the qualifications necessary to render opinions about whether ZOLL complied with FDA regulations with respect to its manufacturing processes.[69]

Moreover, this opinion does not fit the facts of this case, making it irrelevant. The relevance requirement has been described as one of "fit"—if the opinion does not logically relate the facts of the case, then it is not relevant and not admissible.[70] As to the alleged abnormal shutdowns vis-à-vis the known SD card issue, Yanulis himself admitted that even a faulty SD card does not affect the detect-and-treat sequence (as discussed above) and there were no abnormal shutdowns during the roughly 10 minutes at issue.[71] That by itself renders this opinion irrelevant—regardless of ZOLL's knowledge about SD card issues generally or the flagged issue with Anazco's SD card, because the SD card does not have *any* effect on the LifeVest's ability to detect and treat arrhythmias, contrary to Yanulis's opinion, nothing ZOLL could have done would have had any effect on the LifeVest's purported failure to deliver a treatment shock on July 8.

As for ZOLL's alleged failure to conduct a root-cause analysis when it received reports of the monitor's inability to complete the "detect-and-treat" function in July 2019, not only is it not a requirement that ZOLL conduct such an analysis (which Yanulis admitted), but more importantly, the computer analog (CA) board (which includes the ARM and DSP, i.e., the components Yanulis identifies as allegedly being unable to communicate), was completely replaced in October 2019.[72] So, regardless of whether there were in fact any issues with the

---

[68] *Id.* at 72:21–73:2 (note motion to strike non-responsive portion of answer.)
[69] *Quiet Tech.*, 326 F.3d at 1340–41 (11th Cir.2003); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1255 (11th Cir.2005); *In re Trasylol Prod. Liab. Litig.*, No. 08-MD-01928, 2010 WL 4052141, at *2 (S.D. Fla. May 12, 2010) (excluding physician expert from providing FDA regulatory opinions due to lack of qualifications)
[70] *Seamon*, 813 F.3d at 988; *Allison*, 184 F.3d at 1312.
[71] Volpe Decl. ¶ 46.
[72] Partin Decl. ¶¶ 11–12.

monitor—and, more specifically, the ARM and DSP—in July 2019, the complete replacement of the CA board in October 2019 means that those purportedly faulty components were not in Anazco's monitor on July 8, 2020. And Yanulis identifies no purported issues with the monitor or CA board after October 2019. Thus, Yanulis's opinion about ZOLL's purported inaction in July 2019 does not fit his theory of alleged communication failure in July 2020, rendering it irrelevant and inadmissible.

***Rishi Anand, M.D*.**

**I. Dr. Anand's opinions that Anazco experienced VF and that it was the "most likely cause" of decedent's death are inadmissible because of his lack of qualifications and methodology, and because they are not helpful to the trier of fact.**

**A. Dr. Anand failed to employ his own methodology and rule out many other potential causes of Anazco's death, rendering his opinion unreliable.**

It is axiomatic that for an expert's litigation opinion to be reliable, he must employ the same methodology and approach he would in the field.[73] Likewise, for an expert offering an opinion on medical causation issues, it is well settled that the failure to employ a reliable methodology, such as a differential diagnosis, is grounds for exclusion as well.[74] Here, Dr. Anand's opinion meets neither requirement and is unreliable.

Dr. Anand testified that he employs an evidence-based medicine approach when diagnosing patients, which, as explained by him, is very similar to performing a differential diagnosis—i.e., based on the patient's medical history and background, he compiles a list of factors and conditions to consider when determining what is contributing to a patient's symptoms[75]; consults with other specialists for patients with comorbidities outside his field of expertise[76]; and tries to rule out alternative causes and alternative risk factors.[77]

---

[73] *E.g.*, *Kumho Tire Co.*, 526 U.S. at 152 (noting as a requirement of admissibility that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field").
[74] *E.g.*, *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1252–53, 1255 (11th Cir. 2010).
[75] Anand Dep. 23:12–15, 23:21–23, 25:10–14.
[76] *Id.* at 24:11–25:9.
[77] *Id.* at 23:24–24:10.

But here, Dr. Anand did not employ this approach. He did not consider all relevant aspects of Anazco's medical history,[78] nor compile a list of factors and conditions to consider in determining what may have contributed to Anazco's symptoms.[79] He did not consult with other experts about comorbidities in fields outside his expertise or even read the depositions of Anazco's treaters.[80] And he did not evaluate all risk factors or rule out alternative causes he acknowledged existed.[81]

Indeed, Dr. Anand acknowledges that Dr. Blomberg identified potential causes of Anazco's death[82], but admitted he did not even try to rule these out.[83] For example, he could not rule out that Anazco died of acute respiratory failure triggered by aspiration pneumonia.[84] He could not rule out death from acute respiratory failure triggered by heart failure.[85] He could not rule out death from respiratory failure triggered by his metastatic lung disease or from development of deep vein thrombosis followed by a massive pulmonary embolism and cardiac arrest.[86] Further, he could not rule out death from another myocardial infarction, i.e., a heart attack.[87]

Dr. Anand's failure to follow the general methodology he uses in the field when diagnosing a patient, and his failure to rule out other potential causes of Anazco's death, makes his opinion unreliable and is grounds for exclusion.[88]

---

[78] *See, e.g.*, 56:4–58:24 (discussing the medical records he reviewed).
[79] *See generally* Anand Rep.
[80] *E.g.*, Anand Dep. 27:11–16, 55:14–17.
[81] Anand Rep. 4; Anand Dep. 145:6–147:9.
[82] Anand Rep. 4 ("Without an autopsy, the potential causes listed by [Dr. Blomberg] are just possibilities.")
[83] Anand Rep. 4; Anand Dep. 145:6–147:9.
[84] Anand Rep. 4; Anand Dep. 145:6–11.
[85] Anand Rep. 4; Anand Dep. 145:12–16.
[86] Anand Rep. 4; Anand Dep. 145:17–146:7.
[87] Anand Rep. 4; Anand Dep. 147:4–9.
[88] *E.g.*, *Guinn*, 602 F.3d at 1255 ("The reliability of Dr. Marks' methodology is further called into question by her failure to conduct the standard diagnostic techniques she normally used to rule out potential alternative causes."); *Hendrix*, 609 F.3d at 1195–98 (noting the physician "failed to compile a comprehensive list of all possible causes of [the plaintiff's condition] and accordingly that "by failing to include all of the causes currently theorized in the medical literature in his comprehensive list of the possible causes … failed to 'rule out' all possible causes but one"); *Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1294–95 (M.D. Fla. 2009) (noting there

**B. Dr. Anand relies on data that he is not qualified to interpret to render his opinions.**

Dr. Anand testified that without the flag report, he could not have opined on the cause of Anazco's death.[89] But Dr. Anand is not qualified to interpret the flag report, especially in the way he selectively does—by making his own assumptions about what certain flags mean and then ignoring certain data from the report and relying on other data.

Dr. Anand is not a biomedical engineer, nor an engineer of any kind.[90] He is not a software design expert.[91] He admits that he does not know more than ZOLL's engineers about the LifeVest's algorithm or how it works.[92] And he has only seen two flag reports from a medical device in his career, the one here, and one other, which he also reviewed in the context of litigation.[93]

Yet, Dr. Anand relies on *his own* interpretation of the flag report, claiming that once the flag declaring a potentially treatable VF rhythm appeared at 04:20:12, that meant the LifeVest had detected treatable VF with 100% confidence.[94] As explained above in the section regarding Yanulis, this assumption is incorrect and inconsistent with the explanations of ZOLL's engineers—whom Dr. Anand admits know more about the LifeVest's confidence algorithm than him. Moreover, he testified that he does not disagree with Shane Volpe's interpretations of the confidence intervals on the flag report[95]—but then attempts to do just that.

Further, Dr. Anand testified that there are two scenarios that will prevent a shock from happening after gel is released when the device is operating as designed: one, someone presses the response buttons, and two, the device registers a non-shockable rhythm. When pressed for the difference between a nonshockable rhythm and the device not reaching the requisite confidence

---

were "so many *Daubert* problems associated with" the expert doctor's opinion, including his failure to apply "the same scientific rigor to [plaintiff's] case that he employs in his own clinical practice to ascertain the cause" of the claimed condition).

[89] Anand Dep. 181:22–24 ("Q. Without the flag report, would you have been able to provide any opinion as to how Mr. Anazco passed away? A. No."); *also id.* at 167:8–15.

[90] *Id.* at 28:15–19.

[91] *Id.* at 28:20–22.

[92] *Id.* at 165:20–23.

[93] *Id.* at 61:3–6, 62:7–12, 157:4–20.

[94] *E.g.*, *id.* at 168:3–4; Anand Rep. 3.

[95] Anand Dep. 103:20–104:3.

threshold for treatment (which ZOLL claims was the case here), he testified: "I think that's more of a programming question. I wouldn't be able to give you a programming answer on that." In other words, he cannot explain the difference—and therefore cannot rule out that Anazco's device did not shock because it never reached 100% confidence following gel dispersal.

Dr. Anand also inappropriately cherry picks from the flag report without explanation, for instance disregarding numerous asystole flags and focusing on two seconds of flag data. It is well-settled that such an approach is unreliable.[96] For example, he lists an array of heart rate numbers, the bulk of which are above the VF threshold. But those numbers were almost all recorded at the exact same time, and in any event, all within 2 seconds of each other. To the extent he thinks this 2-second window supports an opinion that treatable VF exists, again, this does not comport with the LifeVest design, which requires a *sustained* VF rhythm over more than just a few seconds. Similarly, in the minute *after* the gel dispersal, of the 37 heart rate readings identified on the flag report, 33 were below the VF threshold and only 4 were above it.[97] When asked about numbers below the threshold, Dr. Anand claimed that while "technically that number is below the detection algorithm, … you cannot just look at one number" and instead must "look at the entire slew of numbers, because there are a lot of other numbers that are clearly above the detection algorithm."[98] When pressed about the overwhelming data points below the threshold compared to those above it, he continued: "just as you're putting importance on the low numbers, you, by an equal amount, have to put importance on the high numbers that are over 200" and "you can't just cherry pick low numbers."[99] Nowhere, however, does he explain how in ostensibly affording equal weight to both sets of numbers he is able to conclude, from heart rate data alone, that 4 readings above the VF threshold—none of which are sustained for more than a second—compel a conclusion that VF was present when 90% of the overall data points, i.e., the other 33 readings, are below the VF threshold.

[96] *See, e.g.*, *Allison*, 184 F.3d at 1314 (finding fault with the expert's failure to explain why certain studies relied on trump more voluminous and relevant studies reaching the opposite conclusion).
[97] *See, e.g.*, Flag Report, Ex. 12; *also* Volpe Decl. ¶¶ 37–46 (describing analysis of event).
[98] Anand Dep. 151:17–152:7.
[99] *Id.* at 154:10–155:2.

Because Dr. Anand's speculative and unexplained opinions rest on unqualified assumptions and inadequate factual foundations, they are unreliable and inadmissible.

## II. Dr. Anand's untimely opinion that the LifeVest should have operated differently is a *design opinion*, which he is unqualified to offer and which is irrelevant to the issues in this litigation.

Curiously, despite having retained him in January 2022, Plaintiffs waited until the deadline for serving rebuttal expert reports to furnish ZOLL with Dr. Anand's report. In some respects, Dr. Anand's report is indeed a rebuttal report, albeit an unsupported and conclusory one, in that he purports to address the conclusions of ZOLL's medical expert Dr. Blomberg.[100] But in other respects, his report offers opinions that could have and should have been disclosed at the initial expert disclosure deadline, including his opinion that the LifeVest should have operated differently than it did here because of how Dr. Anand thinks the LifeVest should operate. Untimeliness aside, his opinion about how the LifeVest *should be* designed is inadmissible because it is irrelevant, unreliable, and he is wholly unqualified to make it.

Dr. Anand opines that once VF is detected by the LifeVest, "you have to make the device a little bit more malleable so it doesn't miss VF," because if the device is required to "hit a hundred percent confidence every single time on more than one round, you run the risk of missing VF."[101] In other words, in his opinion, the LifeVest should only need to hit 100% confidence once—which is, indisputably, not how the LifeVest works.

Dr. Anand's opinion is a design defect claim, i.e., Dr. Anand wants to opine that once any VF rhythm is ostensibly detected, a medical device, including the LifeVest, should not have to reach 100% confidence threshold for treatment, because such a requirement runs the risk of not treating VF. But there is no design defect claim in this litigation. Plaintiffs do not have a design defect claim in their Complaint, and such claims are plainly preempted. Thus, his opinion in this regard is irrelevant and unhelpful to the trier of fact.

---

[100] These "rebuttal opinions", i.e., on life expectancy and July 6 discharge, are conclusory ipse dixit and should be excluded.
[101] *E.g.*, *id.* at 96:4–23.

Moreover, to render an admissible opinion on defect, Dr. Anand would need to identify how the LifeVest deviated from its approved FDA design. He makes no attempt to offer on opinion on that or whether ZOLL complied with PMA manufacturing specifications, nor any opinions that ZOLL violated FDA regulations or quality system requirements. Dr. Anand could not offer such opinions given that he is not qualified to do since he is not a biomedical or any other type of engineer, an expert in software or algorithms, or an expert in FDA regulations.

In short, Dr. Anand's opinions regarding the design of the LifeVest are irrelevant, unqualified, and inadmissible.

**CONCLUSION**

ZOLL respectfully requests that, pursuant to Fed. R. Evid. 702 and *Daubert*, this Court grant its motion to exclude George Yanulis and Dr. Rishi Anand and preclude them from testifying in this matter.

Counsel for ZOLL met and conferred with Counsel for Plaintiffs' prior to filing this motion, as required by Local Rule 7.1(a)(3), and was unable to resolve the issues raised herein.

Respectfully submitted,

NELSON MULLINS RILEY
& SCARBOROUGH LLP
*Co-Counsel for Defendants Zoll Services, LLC,*
*Zoll Medical Corp., and Zoll Manufacturing Corp.*
One Biscayne Tower, 21st Floor
2 S. Biscayne Boulevard
Miami, FL 33131
Telephone: 305.373.9425
Facsimile: 305.373.9443
mark.raymond@nelsonmullins.com

By: */s/ Mark F. Raymond*
Mark F. Raymond, Esq.
Florida Bar No. 373397

Elizabeth C. Helm *(Admitted Pro Hac Vice)*
Nelson Mullins Riley & Scarborough LLP
201 17th Street NW, Suite 1700
Atlanta, GA 30363
Telephone: 404.322.6429
kate.helm@nelsonmullins.com

Jenny A. Covington *(Admitted Pro Hac Vice)*
Jenna L. Durr *(Admitted Pro Hac Vice)*
Nelson Mullins Riley & Scarborough LLP
1600 Utica Avenue South, Suite 750
St. Louis Park, MN 55416
Telephone: 612.464.7626
jenny.covington@nelsonmullins.com
jenna.durr@nelsonmullins.com
allison.abbott@nelsonmullins.com

Eden M. Darrell *(Admitted Pro Hac Vice)*
Nelson Mullins Riley & Scarborough LLP
901 East Byrd Street, Suite 1650
Richmond, VA 23219
Telephone: 804.533.3023
eden.darrell@nelsonmullins.com

4863-7501-4441