UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
Case No.: 21-22433-CIV-MARTINEZ-BECERRA

FLOR MORERA LOPEZ, and
ASBERT ANAZCO, individually and
as personal representatives of the
Estate of Asbert E. Anazco,

    Plaintiffs,

v.

ZOLL SERVICES, LLC,
ZOLL MEDICAL CORP., and
ZOLL MANUFACTURING CORP.

    Defendants.

_____/

**SEPARATE STATEMENT OF MATERIAL FACTS
IN SUPPORT OF ZOLL'S MOTION FOR SUMMARY JUDGMENT**

    ZOLL Services, LLC, ZOLL Medical Corp., and ZOLL Manufacturing Corp. ("ZOLL") hereby submit their separate statement of material facts in support of summary judgment.

**I.**    **The LifeVest 4000's Design**

    1.    The ZOLL LifeVest® 4000 is a wearable cardiac defibrillator that continuously monitors the wearer's heart rate and rhythm to detect and, when appropriate, treat certain rapid ventricular arrythmias (VT and VF). (Ex. A, Shane Volpe Decl. at ¶ 5).

    2.    If the LifeVest receives inputs that are consistent with a treatable arrythmia, it will "declare" an arrythmia, and then go through a verification period to verify that the declared rhythm is in fact a sustained rhythm that should be treated. During this period, the device issues alarms, beginning with a tactile vibration followed by audible voice alerts. (Ex. A, Volpe at ¶¶ 23-25).

3.  If the device reaches a certain threshold (72% confidence), it will dispense a conductive blue gel, which is meant to aid in the conduction of the current to the skin if a shock is ultimately delivered. (Ex. A, Volpe at ¶¶ 28-29).

4.  After the gel is dispersed, the device continues to monitor the patient's heart rhythm and other data, and if the threshold for delivering a treatment shock is met (100% confidence), the LifeVest will discharge a treatment, typically shocking the patient's heart back into a normal rhythm. (Ex. A, Volpe at ¶¶ 7, 28-29).

5.  Due to the presence of noise, and other variables, the device's design accommodates for the possibility that the LifeVest may falsely declare a treatable arrhythmia and begin the treatment sequence. (Ex. A, Volpe at ¶¶ 22 & 27).

6.  To delay a potentially imminent treatment, the user can press response buttons, which will terminate or delay the treatment sequence. (Ex. A, Volpe at ¶ 27).

7.  Even if the response buttons are not depressed by patient, the LifeVest may delay treatment after beginning the treatment sequence if the necessary 100% confidence threshold is not reached. The LifeVest will terminate the treatment sequence if the confidence falls and the device declares a "non-treatable rhythm." (Ex. A, Volpe at ¶ 26).

8.  The LifeVest 4000 stores flag data in its internal memory. (Ex. A, Volpe at ¶ 10).

9.  The flag report is essentially a summary record of what the device is doing, through the issuance of key flags, over time. (Ex. A, Volpe at ¶ 10).

10. By design, the declaration of a treatable VF rhythm on the flag report for the Anazco device at 04:20:08 means *only* that the device reached 100% confidence during the *first* "detection" phase. (Ex. A, Volpe at ¶¶ 23-25; 40).

## II. The LifeVest 4000 is a Pre-Market Approved Device

11. The LifeVest 4000 is an FDA-approved, Premarket Approval (PMA) Class III device. The FDA first approved the LifeVest in 2001 through the Premarket Approval process. Since that time, the FDA has approved numerous PMA supplements for the LifeVest. The original and supplemental PMA approvals remain in effect, under the FDA's continuing oversight and regulation, and have never been suspended or revoked. (Ex. A, Volpe at ¶ 5-6; Ex. B, Eugene Partin Decl. at ¶ 6.)

12. The LifeVest 4000 Patient Manual was pre-market approved by the FDA. (Ex. B, Partin at ¶ 7.)

13. The LifeVest 4000 Operator's Manual was pre-market approved by the FDA. (Ex. B, Partin at ¶ 8.)

## III. Asbert Anazco's Medical Condition

14. On May 25, 2020, Anazco was admitted to hospital with severe sepsis and tachycardia. (Ex. C, Deposition of Decedent's Treating Physician, Dr. A. Giron at pp. 35:4-36:1.)

15. By late May to early June 2020, Anazco was in heart failure, and he had metastatic cancer, renal disease, diabetes, hypertension, nephrostomy tubes, and a history of stroke and seizures. (Ex. C Giron at pp. 19:7-22:23; 41-42; Ex. D, Deposition of Decedent's Treating Physician Dr. A. Kaufman pp. 15:1-16:4; 23:4-25:1; 25:2-11; 45:7-9, 66:25:67:4, 68:7-15.)

16. On May 27, 2020, Anazco was prescribed the LifeVest 4000 because he was at risk for rapid ventricular arrythmias. (Ex. E, Deposition of Plaintiffs' Expert Dr. R. Anand p. 49:5-50:1, 50:9-14, 50:19-51:4; Ex. F, Deposition of ZOLL's 30(b)(6) Witness J. Whiting 92:13-22; Ex. G, Anazco LifeVest Prescription ZOLL_ANA000001).

17. On May 28, 2020, Anazco was fitted with a LifeVest 4000 and provided with a Patient Manual (ZOLL_ANA000355-496). Ex. H, Deposition of F. Morera Lopez at. 68:16-22; Ex. I, Patient Manual (ZOLL_ANA000355-496); and Ex. J Rev U of the Patient Agreement (ZOLL_ANA00003-10).

18. He was provided and signed Rev U of the Patient Agreement (ZOLL_ANA00003-10) and Rev H of the Wear Checklist (ZOLL_ANA000011). (Ex. H, Lopez at. 69:10-19 and 72:1-4; Ex. J Rev U of the Patient Agreement (ZOLL_ANA00003-10); and Ex. K Rev H of the Wear Checklist (ZOLL_ANA000011).)

19. The Patient Agreement states on p. ZOLL_ANA000005:

- I will cooperate with ZOLL for the repair, exchange, service and/or collection of LifeVest and I will provide ZOLL with access to LifeVest as needed.

- I will promptly report any malfunctions, service codes, or defects in LifeVest to **ZOLL** by calling **1-800-543-3267** (24-hour support) so that repair or replacement can be arranged. Failure to do so could leave me unprotected. I acknowledge that in certain circumstances, ZOLL reserves the right to refuse replacement of equipment such as when previous equipment has been misused or abused or ZOLL has determined that the request is not valid or appropriate.

- I am responsible for ensuring the contact information I give to ZOLL is current and up to date. I will update ZOLL if my phone or mobile number changes by calling **1-800-543-3267** or emailing patientcontact@zoll.com. Among other permissible reasons, this will allow ZOLL to keep track of LifeVest as mandated by the FDA.

(Ex. J Rev U of the Patient Agreement (ZOLL_ANA00005).

20. After May 27, Anazco's medical condition worsened. He had another heart attack and was diagnosed with metastatic cancer in his lungs and bones. (Ex. C, Giron at pp. 37:1-13, 38:2-39:16; 41; 43-45; 47; Ex. D, Kaufman at pp. 66:14-67:9).

21. Anazco was in the hospital 25 of the last 45 days of his life and by June 26, he was offered hospice care. (Ex. E, Anand p. 139:14-21).

22. On June 26, 2020, Anazco's wife told her husband's doctors that she wanted no further invasive procedures. Ex. L, Mercy Hospital Record (ANAZCO_SUBPOENA002924).

23. On June 26, 2020, Anazco was offered hospice care. Ex. L, Mercy Hospital Record (ANAZCO_SUBPOENA002924).

24. On July 3, 2020, Anazco was readmitted to hospital with respiratory problems and was treated in the intensive care unit on July 4, 2020. (Ex M, Mercy Hospital ANAZCO_SUBPOENA003534-3538; Ex. C, Giron at p. 32:12-33:13.)

25. He was discharged on July 6, 2020. (Ex M, Mercy Hospital ANAZCO_SUBPOENA003534-3538)

26. At the time, per his own treating doctor his prognosis was "really bad. He was living beyond his time …. He was really, really sick for a long time…. His life expectancy was very short." (Ex. C, Giron at p. 55:3-10.)

27. Anazco passed away in the early morning hours of July 8, 2020 at age 82. (Ex. N, Deposition of First Responder, D. Villavicencio pp. 12:3-6; 26:3-16.)

**IV.    Detect and Treat Testing**

28. The computer analog (CA) board and defib or high voltage board in Anazco's monitor were replaced in October 2019, meaning that any issues, to the extent that they existed in July 2019, were resolved a few months later—and several months before Anazco was prescribed the LifeVest. (Ex. B, Partin at ¶ 12.)

**V.    Functionality of the SD Card**

29. The SD card—a secure data memory card inserted in a slot behind the device's battery—has no impact whatsoever on the LifeVest's ability to both detect and treat a treatable VF arrhythmia. (Ex. A, Volpe at ¶ 11).

30. The SD card is not part of the safety critical piece of the device, and it has no impact to the device's ability to deliver treatment. (Ex. A, Volpe at ¶ 11).

31. Service code 104—the only service code that appears in the flag report for Anazco's monitor —relates to SD card issues. (Ex. A, Volpe at ¶ 34). Service code 104 first occurred on Anazco's monitor on June 25, 2020.

32. ZOLL uses a multi-layered approach to address service code 104 including: (1) having the patient sign an agreement to report services codes promptly and that they will keep their contact information current, (2) a system by which downloads of flags alert ZOLL Technical Support to the occurrence of these service codes on a particular patient monitor, (3) a protocol by which ZOLL Technical Support calls the numbers provide by the patient several times, and (4) in the event the patient or designated contact persons decline to respond to these calls, ZOLL then sends a letter seeking that the monitor be exchanged. (Ex. O, Deposition of Leanne McCruit Dep. at pp. 57-61, 65, and 70).

33. ZOLL followed its multi-layered approach to address service code 104: It called Anazco at the number provided, but was not able to leave a message. It reached Plaintiff Asbert Anazco Jr. by phone on July 1, 2020, and was told it had the wrong number. ZOLL made four attempts total to contact Anazco and his family by phone, but other than this one instance, no one picked up the phone. And on July 8, 2020, it sent a written letter regarding the request for the monitor exchange. (Ex. O, McCruit at 57-61, 65 and 70).

**VI.   Decedent's Fit Process**

34. Plaintiff Anazco Jr. was not present during the fit process. (Ex. P, Anazco Jr. Dep. pp. 139:6-13.)

35. Plaintiff Anazco Jr. did not see or rely upon any materials from ZOLL before his father began using the LifeVest. He reviewed the patient manual after Anazco returned home with the LifeVest but could not recall any specifics. (Ex. P, Anazco Jr. at pp. 139:20-23, 140:4-140:22.)

36. Plaintiff Flor Morera Lopez testified that her husband Anazco was the one who made the decision to accept the LifeVest prescription. (Ex. H, Lopez at. pp. 69:10-71:24, 72:1-12, 72:15-20.)

37. Anazco, the user of the LifeVest, signed a patient agreement in which he expressly agreed that he would "*not* rely on any verbal representations, promises, or assurances made by any ZOLL representative inconsistent with written materials provided by ZOLL concerning my use of LifeVest." (Ex. H, Lopez at pp. 69:10-71:24, 72:1-12, 72:15-20. Ex. J Rev U of the Patient Agreement (ZOLL_ANA000010).)

38. Anazco both read and spoke English. (Ex. H, Lopez pp. 68:23-69:2.).

39. Plaintiff Lopez testified that she never read any materials and only heard what was said by the ZOLL representative. She had no understanding of what conditions the LifeVest was designed to treat. (Ex. H, Lopez p. 68:21-22, 69:3-6, 73:5-7.

40. Plaintiff Lopez claimed the ZOLL representative told her and Anazco that the LifeVest had two alarms: one which instructed the wearer to adjust the vest, and the second "to advise you that the person was unconscious and that the device would give him a shock to revive the person." (Ex. H, Lopez p. 68:7-15.)

41. Plaintiff Lopez claimed they were told that "if the person was unconscious, the machine would then give the person a shock to revive the person." Ex. H, Lopez p. 68:7-15.)

42. Plaintiffs Lopez testified that it was on the basis of this explanation that her husband decided to accept the LifeVest prescription. (Ex. H, Lopez p. 71:10-19.)

43. ZOLL Services, LLC Limited Warranty states:

**ZOLL SERVICES, LLC LIMITED WARRANTY**

ZOLL Services, LLC ("ZOLL") hereby warrants to you that your LifeVest® wearable cardioverter defibrillator including the monitor, electrode belt, batteries and charger (collectively the "LifeVest") will be free from defects in material and workmanship under normal use and that ZOLL will provide the reasonable and customary support services expected of all of ZOLL's patients for three years from the date of your first use (the "Warranty Period").

During the Warranty Period, ZOLL will, at no charge to you, repair or replace any part of the LifeVest as deemed reasonably necessary by ZOLL to ensure that it performs to the standards of safety and effectiveness set forth by the Food and Drug Administration. ZOLL shall not be responsible for any defect, failure to perform any specified function, or any other nonconformance, caused by or attributable to any modification, use, or misuse of the LifeVest by you or others that is inconsistent with the instructions specified in the labeling, patient manual, or reference guide.

This warranty is exclusive to you for the duration of the prescribed use (from a medical professional) and is not transferrable. This warranty is ZOLL's sole obligation to you for defects relating to your LifeVest.

Your acknowledgement of the risks of using the LifeVest and your ongoing obligations with respect to its safe and effective use as set forth in your patient agreement and the patient manual continue to apply.

ZOLL EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES WHETHER WRITTEN, ORAL, IMPLIED, OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES OF TITLE OR NONINFRINGEMENT, OR WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OF TRADE.

(Ex. B, Partin at ¶ 16.)

### VII. Plaintiffs' Expert's Testimony

44. While both Plaintiffs' experts were wrong about the confidence level at gel fire, each nonetheless agreed the device could determine that a patient's rhythm is non-treatable after

gel is fired. (Ex. Q, Deposition of Plaintiffs' Expert G. Yanulis pp. 77:16–20, 112:10–18, 150:9–19; Ex. E, Anand pp. 72:24–73:19, 74:18–75:3.)

45. Neither Yanulis nor Anand could rule out that Anazco's rhythm was non-treatable after gel fire. (Ex. Q, Yanulis p. 145:6–12; Ex. E, Anand pp. 73:23–74:15.)

46. Plaintiffs, through their experts, agree the Anazco device *never* hit 100% confidence during the second phase—the "treatment phase" which occurs after the "detection phase"; instead, it decreased to a confidence level of zero over the next minute before declaring a non-treatable rhythm. (Ex. Q, Yanulis p. 131:12–20; Ex. E, Anand p. 168:14–21.)

47. Anand admits that the LifeVest is designed to deliver a shock, generally speaking, when the pre-set thresholds set by the patient's treating doctor are met. (Ex. E, Anand pp. 66:6-16; 71:7-25.)

48. In accordance with LifeVest's FDA approved design, no sustained *treatable* VF rhythm requiring a treatment shock was detected by Anazco's LifeVest, a conclusion with which even Yanulis and Dr. Anand agree. (Ex. E, Anand pp. 147:12–14, 168:14–21; Ex. Q, Yanulis pp. 107:18–21, 113:6–8, 150:9–19.)

49. Yanulis attended the testing of the LifeVest on January 7, 2022. The LifeVest passed all testing. However, Yanulis never examined the microprocessors during the inspection, nor has he ever requested to do so. (Ex. Q, Yanulis pp. 164:9–165:3.)

50. Yanulis contended that the failure to provide a shock was a result of hardware failure within the computer analog board, but could not identify any particular component failure. (Ex. Q, Yanulis pp.162:22–164:21.)

51. Yanulis agrees that the SD card has no impact on the ability of the LifeVest to both detect and treat a treatable VF arrhythmia. (Ex. Q, Yanulis p. 166:1-6.)

52. Yanulis disavowed that he was offering opinions as to whether a treatment from the LifeVest would have saved Anazco's life if it had been delivered. (Ex. Q, Yanulis p. 62:8–12.)

53. Dr. Anand opines that the LifeVest was a "contributing element of his death in that it detected ventricular fibrillation, deployed the gel, but did not deliver a treatment shock." (Ex. R, Anand Report at p. 4.)

54. Dr. Anand admitted he had no opinion on life expectancy for Anazco. (Ex. E, Anand p. 104:7–9.)

Respectfully submitted,

NELSON MULLINS RILEY
& SCARBOROUGH LLP
*Co-Counsel for Defendants Zoll Services, LLC,
Zoll Medical Corp., and Zoll Manufacturing Corp.*
One Biscayne Tower, 21st Floor
2 S. Biscayne Boulevard
Miami, FL  33131
Telephone:   305.373.9425
Facsimile:    305.373.9443
mark.raymond@nelsonmullins.com

By: */s/ Mark F. Raymond*
       Mark F. Raymond, Esq.
       Florida Bar No. 373397

Elizabeth C. Helm *(Admitted Pro Hac Vice)*
Nelson Mullins Riley & Scarborough LLP
201 17th Street NW, Suite 1700
Atlanta, GA 30363
Telephone: 404.322.6429
kate.helm@nelsonmullins.com

        Jenny A. Covington *(Admitted Pro Hac Vice)*
        Jenna L. Durr *(Admitted Pro Hac Vice)*
        Nelson Mullins Riley & Scarborough LLP
        1600 Utica Avenue South, Suite 750
        St. Louis Park, MN 55416
        Telephone: 612.464.7626
        jenny.covington@nelsonmullins.com
        jenna.durr@nelsonmullins.com
        allison.abbott@nelsonmullins.com

        Eden M. Darrell *(Admitted Pro Hac Vice)*
        Nelson Mullins Riley & Scarborough LLP
        901 East Byrd Street, Suite 1650
        Richmond, VA 23219
        Telephone:  804.533.3023
        eden.darrell@nelsonmullins.com