UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 21-22433-CIV-MARTINEZ-BECERRA

**FLOR MORERA LOPEZ**,
and **ASBERT ANAZCO**,
individually and as personal
representatives of the Estate
of Asbert E. Anazco,

    Plaintiffs,

vs.

**ZOLL SERVICES, LLC**,
**ZOLL MEDICAL CORP.**,
and **ZOLL MANUFACTURING CORP.**,

    Defendants.
_____/

**PLAINTIFFS' OPPOSITION TO ZOLL'S
MOTION FOR JUDGMENT AS A MATTER OF LAW**

Plaintiffs, Flor Morera Lopez and Asbert Anazco, individually and as personal representatives of the Estate of Asbert E. Anazco, oppose the Rule 50 motion for judgment of Defendants Zoll Services, LLC, Zoll Medical Corp., and Zoll Manufacturing Corp., and state:

**Standard of Review**

The standard for judgment as a matter of law "mirrors" the standard for granting summary judgment, "such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). In particular, a Rule 50 judgment is proper only "when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1192 (11th Cir. 2004). In making its determination, a court "must review all of the evidence in the record and must draw all reasonable inferences in favor of the nonmoving party." *Id*. at 1192-93. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id*. "'[A]lthough the court

should review the record as a whole, ***it must disregard all evidence favorable to the moving party that the jury is not required to believe***.'" *Id*. (emphasis added; brackets in original).

Here, as to each and every claim, Plaintiffs introduced evidence at trial matching the evidence that the Court pointed to in denying Zoll's motion for summary judgment under Rule 56, which advanced the same arguments Zoll repeats now. Thus, Plaintiffs respectfully submit that the Court should likewise deny Zoll's motion for judgment as a matter of law under Rule 50.

**A.  Manufacturing Defect Claims (Counts 1-4 for Strict Liability, Negligent Manufacturing)**

**1. The Trial Evidence Supports A Jury Finding Of A Manufacturing Defect And Causation.**

As the Court observed in rejecting Zoll's motion for summary judgment:

> Here, there is a disputed issue of fact as to whether the LifeVest was defective. Plaintiffs contend that the LifeVest was designed to deliver a treatment shock after it dispersed the blue gel. Plaintiffs have provided expert testimony that the LifeVest should have delivered a treatment shock but failed to do so because of a capacitor discharge failure, and that the discharge failure was most likely the result of a microprocessor communication fault. Plaintiffs have also put forth evidence that the LifeVest's failure to deliver a treatment shock was a contributory factor in Anazco's death.
>
> ***
>
> Zoll makes two preemption arguments. First, it argues that the failure to identify a specific defect is dispositive because a generic defect is insufficient to show Anazco was harmed by a violation of federal laws. Plaintiffs have, however, specified that the purported manufacturing defect was 'most likely the result of a microprocessor communication fault.' A reasonable jury could conclude that the incident was a result of a microprocessor communication fault caused by Defendants' breach of federal laws.

(D.E. 247 at 13, 19 (citations omitted).)

At trial, Plaintiffs' expert witnesses—Dr. Yanulis and Dr. Anand—provided substantially the same testimony upon which the Court relied in denying Zoll's motion for summary judgment.

For instance, on Tuesday, January 31, 2023, Dr. Yanulis testified as follows:[1]

Q. Do you have an opinion as to whether or not this device should have delivered a shock on July 8th?

A. Yes it should have but it didn't and the basis of it is that a VF was detected, the device had gone through a full treatment sequence and it should have delivered a shock within approximately five seconds after gel release.

Q. Do you have any opinions, doctor, as to what aspect of the treatment sequence caused the device to not deliver a shock?

A. Yes. The failure to shock was due to a capacitor discharge failure.

Q. And can you explain to the jury, doctor, what is a capacitor discharge failure?

A. That's when the energy that has been charged is not properly delivering the charge as treatment shock therefore the patients won't get a shock delivered to them.

Q. Do you know, doctor, how the device works as to commanding or doing anything to deliver a shock?

A. Yes. The ARM processor will issue commands to the DSP processors to first charge the capacitors with energy and then deliver that shock or deliver that energy as a treatment shock.

Q. And do you have any opinions as to whether or not that command occurred on July 8th with respect to Mr. Anazco's device?

A. No, I didn't -- there was none because as I said, the treatment the delivery if delivery had been provided it would have said treatment has been given call your physician and that was not seen on the flag report.

Q. Do you have any opinions as to what caused the capacitor discharge failure, doctor?

A. Yes, I do. It was more than likely the miscommunication interruption or fault between the ARM and the DSP processors.

Q. What is your understanding of the role of the ARM and DSP processors as it relates to the detect and treat process, doctor?

A. Sure. The DSP is going to analyze the ECG recording and provide that communicate that information to the ARM. The ARM issues commands to the DSP to first charge the capacitors and then it later released as a treatment shock.

Q. And can you explain what it is that caused that discharge not to occur?

A. Yes. More than likely it was the miss communicationss [sic] of the two processors.

Q. Is there any evidence that supports your conclusion that it was a miss communications issue?

A. Yes. The there were abnormal shut downs occurring with what is known as SD card false.

---

[1] Based on rough drafts of the trial transcripts.

Q. And can you explain to the jury what your understanding is of an abnormal shut down, doctor?

A. Sure. An abnormal shut down in itself is a feature of the LifeVest where the device will reboot if it detects any kind of interruption between the DSP and the ARM. And has to be for at least five seconds.

Q. What must happen as it relates to the ARM and DSP for the device to deliver a shock?

A. There has to be a command issued from the ARM to the DSP to deliver that energy as a treatment shock and that did not occur.

Q. Is it your opinion, doctor, that besides what you just described as being a fault, that do you have any opinion as to whether or not the treatment sequence outside of what you just said,

A. Sure.

Q. Followed what we saw on the chart. . . .

THE WITNESS: Thank you. The abnormal shutdowns were happening with the SD card faults which I also saw on the flag report.

BY MR. LEE: Q. Doctor do you have any opinion as to whether an SD card how or if it can impact treatment?

A. Yes. The SD card records the ECG of the patient. And if it's missing then you don't have a recording of the patient's ECG.

Q. Is there would a card by itself impact the device's ability to treat or not treat?

A. Yes it would but in this case the SD card in itself in isolation was fine and in working condition but there was a problem in the fact that the abnormal shutdowns were happening together with the SD card fault.

Q. Do you have an opinion doctor as what was the likely reason that the device performed as it did?

A. More than likely again it's the miscommunication interruptions between the ARM and the DSP.

(January 31, 2023 P.M. Session 78:10-81:17.)

Dr. Yanulis also corroborated what he saw during the device's inspection at Zoll's facility:

Q. As part of that inspection, did you see or make any observations as to the SD card that was in Mr. Anazco's device?

A. Yes, I did. During the Zoll testing of the SD card, the label was partially detached which is over the SD card and the SD card was dislodged from its slot.

(January 31, 2023 P.M. Session 82:19-23.)

In addition, Dr. Anand testified as follows:

Q. Okay. And did you reach an opinion as to what occurred on the morning of July 8, 2020 as it relates to Mr. Anazco?

A. Yes, I did. I'm of the opinion that Mr. Anazco had ventricular fibrillation, cardiac arrest.

Q. And did you reach any opinions as to whether or not Mr. Anazco should have received a shock on the morning of July 8th?

A. Yes. I did reach an opinion.

Q. And what is that opinion, doctor?

A. Mr. Anazco should have received a lifesaving shock from his Zoll LifeVest as evidenced by the deployment of gel from the LifeVest jacket but the shock was not delivered.

Q. Did you reach any opinions as to whether or not the lack of a shock was a contributory element in Mr. Anazco's passing on July 8th?

A. Yes. I'm of the opinion that the lack of a shock was a contributory element to Mr. Anazco's passing.

(February 3, 2023 P.M. Session 25:17-26:8.)

As the Court found at summary judgment, Dr. Yanulis and Dr. Anand's testimony alone precludes a matter-of-law finding for Zoll on the manufacturing defect claims—*i.e.*, the strict liability and negligent manufacturing claims (Counts 1-4). Quoting the Court's own findings, "there is a disputed issue of fact as to whether the LifeVest was defective. . . . Plaintiffs have provided expert testimony that the LifeVest should have delivered a treatment shock but failed to do so because of a capacitor discharge failure, and that the discharge failure was most likely the result of a microprocessor communication fault. Plaintiffs have also put forth evidence that the LifeVest's failure to deliver a treatment shock was a contributory factor in Anazco's death. . . . A reasonable jury could conclude that the incident was a result of a microprocessor communication fault caused by Defendants' breach of federal laws." (D.E. 247 at 13, 19 (citations omitted).)

In other words, judgment for Zoll is precluded because, disregarding all evidence favorable to Zoll that the jury is not required to believe (as the Court must do), a reasonable jury could find that Zoll provided a device to Mr. Anazco that deviated from its PMA manufacturing

-5-

specifications, as reflected in (a) its performance during the event at issue—*i.e.*, did not deliver a shock it should have delivered due to a capacitor discharge failure caused by microprocessor communication interruptions that were related to an SD card fault the device was detecting while unable to record ECGs; and (b) its inspection—*i.e.*, the SD card label was partially detached, and the SD card was dislodged within its slot, leading to the reasonable jury conclusion that Zoll failed to properly affix the label so as to secure the SD card for customary patient use. A Class III device that deviates from its PMA specifications is in violation of federal law—*i.e.*, the Medical Device Amendments of 1976 (MDA). *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 319 (2008) ("Once a device has received premarket approval, the MDA forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness. . . . [T]he FDA requires a device that has received premarket approval to be made with almost no deviations from the specifications in its approval application, for the reason that the FDA has determined that the approved form provides a reasonable assurance of safety and effectiveness."); *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1325 (11th Cir. 2017) (explaining federal preemption law, and noting that "after the FDA approves a device, the manufacturer may not make any change to the device's specifications, or anything else that might affect its safety and effectiveness, unless it submits a supplemental application to the FDA."); 20 C.F.R. § 820.1(y) ("*Specification* means any requirement with which a product, process, service, or other activity **must** conform.") (emphasis added).

Similarly, as Dr. Anand testified, the failure to deliver a defibrillating shock was a contributory element to Mr. Anazco's death. That is sufficient for a jury finding of causation, as the Court observed in its summary judgment ruling. (D.E. 247 at 13 ("Plaintiffs have also put

forth evidence that the LifeVest's failure to deliver a treatment shock was a contributory factor in Anazco's death.").)

Stated otherwise—and contrary to what Zoll argued at summary judgment and again advances here—all that is required for causation is "a reasonable basis" for a jury conclusion that, more than likely, the defect or conduct at issue in a particular claim was a "substantial factor"—<u>not the only factor, or even fifty-one percent factor</u>—in the death, so that it can reasonably be said that, but for the defect or conduct, the death would not have occurred. *Whitney v. R.J. Reynolds Tobacco Co.*, 157 So. 3d 309, 312 (Fla. 1st DCA 2014) (explaining causation).

"***In other words, the plaintiff must show that what was done or failed to be done probably would have affected the outcome***." *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984) (emphasis added); Fla. Std. Civil Jury Instr. § 403.12 ("[A defect in a product] [Negligence] is a legal cause of [loss] [injury] [or] [damage] if it directly and in natural and continuous sequence produces or contributes substantially to producing such [loss] [injury] [or] [damage], so that it can reasonably be said that, but for the [defect] [negligence], the [loss] [injury] [or] [damage] would not have occurred. . . .  In order to be regarded as a legal cause of [loss] [injury] [or] [damage], [a defect in a product] [negligence] need not be the only cause.  [A defect in a product] [Negligence] may be a legal cause of [loss] [injury] [or] [damage] even though it operates in combination with [the act of another] [some natural cause] [or] [some other cause] if the [defect] [negligence] contributes substantially to producing such [loss] [injury] [or] [damage].  [A defect in a product] [Negligence] may also be a legal cause of [loss] [injury] [or] [damage] even though it operates in combination with [the act of another] [some natural cause] [or] [some other cause] occurring after the [product defect] [negligence] occurs if such other cause was itself reasonably foreseeable and the [product defect] [negligence] contributes substantially to producing

such [loss] [injury] [or] [damage] [or] [the resulting [loss] [injury] [or] [damage] was a reasonably foreseeable consequence of the [product defect] [negligence] and the [product defect] [negligence] contributes substantially to producing it].**")** (emphasis added); *accord* Fla. Std. Civil Jury Instr. §§ 409.6; 401.12 (same).

Zoll cites *Chaskes v. Gutierrez*, 116 So. 3d 479, 488 (Fla. 3d DCA 2013), and *Prieto v. Total Renal Care, Inc.*, 843 F. App'x 218, 226 (11th Cir. 2021), both of which are distinguishable. That is, in both instances the deficiency with the proof on causation was that the testimony at issue addressed the elements of duty and breach, not causation as required under Florida law. *Chaskes*, 116 So. at 485-88 (outlining the testimony at issue, noting it was insufficient for causation, adding: "while Dr. Stern's testimony might support the conclusion that within a reasonable degree of medical probability Dr. Chaskes owed a duty to Jaquez and breached that duty, it cannot support the conclusion that this 'breach' was the proximate cause of injury to Jaquez."); *Prieto*, 843 F. App'x at 226 ("None of the witnesses' testimony upon which Prieto relies addressed the issue of causation. Specifically, Prieto relies on the testimony of Dr. Ali, Nurse Alfonso, and technician Ventura Valdez as identifying TRC's negligence in failing to send Mr. Prieto home in a stretcher. But while Dr. Ali's and Nurse Alfonso's testimony could support a fact-finder's conclusion that TRC breached its duty of care—a contention TRC does not dispute on appeal—neither witness offered any testimony that Mr. Prieto's injuries more likely than not resulted from TRC's failure to send him home on a stretcher. Indeed, when Dr. Ali was asked whether Mr. Prieto would have suffered 'any injury' if he had been on a stretcher which was bolted to the van's floor, Dr. Ali did not express an opinion. Furthermore, although Prieto on appeal does not address or discuss the testimony of her expert, Nurse Hall, a review of Nurse Hall's testimony shows that she did not testify that Mr. Prieto's injuries more likely than not resulted from TRC's failure to have Mr. Prieto

leave in a stretcher. Instead, Nurse Hall opined only as to TRC's breach of the acceptable standard of nursing care because of its failure to place Mr. Prieto on a stretcher. Evidence of breach of duty of care is not enough to succeed on a claim of medical malpractice . . . .") (footnote omitted).

In sum, in this case Dr. Anand testified that the failure to deliver a defibrillating shock was a contributory element to Mr. Anazco's death, and upon Zoll's causation argument at summary judgment (D.E. 147 at 8-10), this Court already found that substantially the same testimony was sufficient for a jury finding of causation. (D.E. 247 at 13 ("Plaintiffs have also put forth evidence that the LifeVest's failure to deliver a treatment shock was a contributory factor in Anazco's death.").) The same result is compelled here under the same governing standard. Thus, Zoll is not entitled to judgment as a matter of law on Plaintiffs' manufacturing defect claims.

### 2. Alternatively, A Manufacturing Defect Can Also Be Established Via A *Cassisi* Inference.

If the Court were to determine that the evidence in support of a jury finding of a manufacturing defect is insufficient, Plaintiffs would alternatively be entitled—upon a jury finding the device (a) malfunctioned, (b) during normal use—to a legal inference the device was defective.

"Under Florida law, a plaintiff in a products liability action may prove his case by 'creating a legal inference that the product was defective both at the time of the injury and at the time it was within the control of the supplier.'" *Nelson v. Freightliner, LLC*, 154 Fed. Appx. 98, 105 (11th Cir. 2005) (quoting *Cassisi v. Maytag Co.*, 396 So. 2d 1140 (Fla. 1st DCA 1981));[2] *accord*

---

[2] The inference can arise in a products liability action—whether founded on strict liability, negligence, and/or breach of an implied warranty as in *Cassisi*—where there is a requirement to prove damages caused by a product in a defective condition at both the time of an incident and previously when in the manufacturer or retailer's possession. *Cassisi*, 396 So. 2d at 1142; *Ainsworth v. KLI, Inc.*, 967 So. 2d 296, 301-02 (Fla. 4th DCA 2007) (noting the same).

*McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1258 (11th Cir. 2002) (noting the same in a case involving a medical device).

"This inference, known as the *Cassisi* inference, 'arises from the occurrence of the accident itself.'" *Nelson*, 154 Fed. Appx. at 105. "The *Cassisi* inference permits a plaintiff to bring a products case to a jury even though the plaintiff cannot pinpoint a defect in the product." *Id.*; *Cassisi*, 396 So. 2d at 1150 n. 22 (noting that even in a negligence action a plaintiff is not required to establish "a specific product defect since the proof of defect can be established by reasonable inferences from the circumstances."). "The plaintiff must prove only that a product malfunctioned during its normal use". *Nelson*, 154 Fed. Appx. at 105 (emphasis added); *accord McCool v. Woodstream Corp.*, 187 F. Supp. 3d 1338, 1344-45 (S.D. Fla. 2016) (Rosenberg, J.) (same).

"In order for a *Cassisi* inference to arise, the plaintiff's testimony regarding a malfunction is sufficient circumstantial evidence, without expert corroboration . . . to reach the jury and the plaintiff is not required to pinpoint the defect and exclude all other possible explanations for the malfunction." *Ainsworth v. KLI, Inc.*, 967 So. 2d 296, 302 (Fla 4th DCA 2007).

In short, "the facts essential for the inference's application are simply proof of the malfunction during normal operation." *Id*. (emphasis in original) (quoting *Cassisi*, 396 So. 2d at 1151); *accord Blackhawk*, 2015 WL 11176299, at *3 (Martinez, J.) (noting the same in a case involving a negligence claim). Furthermore, the inference operates irrespective of whether the product at issue is available for testing. *McCool*, 187 F. Supp. 3d at 1345 (citing authorities).

Here, there is ample evidence the device (a) malfunctioned, (b) during normal use. The device: (1) detected a treatable arrhythmia (VF); (2) commenced a treatment sequence captured in a 911 call recording that exhausted all the audible notifications leading to an imminent shock (including the prompt for bystanders to not interfere emitted approximately five seconds

prior to an initial defibrillating shock); (3) charged its capacitors; (4) dispensed blue gel, reflecting <u>the device determined that a defibrillating shock was needed</u>, and was to be delivered within approximately five seconds; (5) did not detect pressed response (delay) buttons at any point between the start of the treatment sequence and when the defibrillating shock was to be delivered; (6) did not detect dual lead noise at any point between the start of the treatment sequence and when the defibrillating shock was to be delivered; (7) did not detect a non-treatable rhythm at any point between the start of the treatment sequence and when the defibrillating shock was to be delivered; but, (8) did not deliver a defibrillating shock.

The evidence on these points, which again, must be viewed most favorably to Plaintiffs, supports a jury finding that a malfunction during normal use is precisely what happened here—*i.e.*, the device malfunctioned in that it should have, but did not deliver a defibrillating shock to Mr. Anazco. Thus, judgment as a matter of law would be improper. *See Edic ex rel. Edic v. Century Products Co.*, 364 F.3d 1276, 1284-86 (11th Cir. 2004) (reversing the district court's defense judgment as a matter of law after a trial of design and manufacturing defect claims, finding the questions of whether the device (a) malfunctioned, (b) during normal use, were for the jury).

**B. <u>Common Law Negligence Claim (Count 5)</u>**

As the Court observed at summary judgment, "Plaintiffs argue that Defendants knew they had to replace the LifeVest based on the alerts from the flags but failed to do so despite 'ample notice, time and opportunity.'" (D.E. 247 at 14.) In this respect, the Court found "[t]here are disputed issues of fact as to whether Zoll breached any duty when it failed to replace the LifeVest, and whether the failure to replace the LifeVest caused Anazco's death." (*Id*. at 14-15.)

The same reasoning precludes judgment as a matter of law for Zoll in light of the evidence introduced at trial. Again, disregarding—as the Court must—all evidence favorable to Zoll that

the jury is not required to believe, by June 30, 2020, Zoll knew that Mr. Anazco's device had experienced a service code that required its replacement. Instead, Zoll proceeded to call and send a letter, with Mr. Anazco dying on July 8, 2020, during an event the device should have treated.

| Call Detail: | |
|---|---|
| 6/30/2020 12:17:02 AM<br>Angela Palumbo | Patient's download revealed an occurrence of the service code 104, due to the monitor detecting a faulty or missing SD memory card. While the monitor will continue normal monitoring operations and treatment operations will be performed if needed, ECG event recording, Holter recording, and data downloading capabilities will be disabled until the problem is corrected. Patient is still protected, but despite a successful download having been received, the monitor will need to be replaced; even one occurrence of this service code prompts the exchange of the monitor. |
| 7/1/2020 8:52:31 AM<br>Mary Whisinnand | TS RMA'ed equipment and called PT @(305-244-8820) LM. (This number is the same number as listed for his wife). TS then called his son @ (305-303-5581) and the man that answered indicated that this is a wrong number. No other numbers listed on PA. |
| 7/3/2020 10:55:27 AM<br>Mary Whisinnand | TS RMA'ed equipment and called PT @(305-244-8820) LM. NO other numbers on PA. |
| 7/7/2020 9:46:56 AM<br>Mary Whisinnand | TS called PT @(305-244-8820) LM. No other numbers on PA. Sending email to night tech to send letter and submit. |
| 7/8/2020 1:32:01 AM<br>Wesley Pollow | letter sent, TS to submit. |

(Joint Trial Ex. 3.) In short, a reasonable jury may find that, through its conduct, Zoll breached a duty to replace the device, causing Mr. Anazco's death, and resulting in Plaintiffs' damages.

Moreover, contrary to what Zoll argues, Plaintiffs' common law negligence claim is not subject to a PMA preemption argument. Rather, as in *Godelia*, the premise of the claim is <u>Zoll's undertaking to replace device</u>, which is not part of any FDA PMA requirement. *Godelia v. Doe*, 881 F.3d 1309, 1322 (explaining that common law claims premised on Zoll undertakings above what the FDA regulations require are not preempted). Thus, what Zoll argues lacks merit.

C. **Representations Claims (Counts 6-9 for Fraudulent and Negligent Misrepresentation, Fraudulent Marketing/Promotion, and Breach of Express Warranty)**

As to the claims based on representations, the Court explained at summary judgment:

Each of these four claims arise from the Marketing Statement by Defendants' representative, Raquel Diaz, to Lopez and Anazco stating that once the LifeVest alarmed that a heart arrythmia was occurring, "if you do not press the LifeVest's response buttons, the device will determine you are unconscious and *will* deliver the treatment shock." Because there is a disputed issue of fact as to whether the Marketing Statement was false, misleading, and made without a factual basis, summary judgment for Defendants on Counts 6, 7, 8, and 9 is denied.

(D.E. 247 at 16 (citation omitted; emphasis in original).)

The same finding is warranted based on Ms. Morera Lopez's trial testimony. She stated:

> THE WITNESS: [Ms. Diaz] put the vest on him and then she explained that the vest had two alarms. One that was a mild soft alarm that was to adjust the vest and that when the strong alarm would come on that that that meant that the vest would determine that my husband was uncon anxious [sic] and that it would give him a shock so that he would resuscitate him and save him. Whenever the strong alarm would come on, when that alarm came on everybody had to move away because it was going to give him a shock.

(February 1, 2023 P.M. Session 140:1-8.)

Similarly, the Patient Agreement that Mr. Anazco signed states:

> I am aware that LifeVest is designed to monitor my heart continuously in order to detect certain life threatening rapid heart rhythms (arrhythmias). <u>If LifeVest detects such a heart rhythm it will first issue an alarm. The alarm will be followed by a treatment shock if I lose consciousness or otherwise fail to press the response buttons on the device.</u> The treatment shock is designed to restore both my normal heart rhythm and consciousness.

(Plaintiffs' Trial Ex. 53-3 at 1.)

Thus, with respect to any Zoll lack-of-reliance argument based on the Patient Agreement, it will be for the jury to determine whether the representations Zoll made via its representative were consistent with the written materials Zoll provided to Mr. Anazco in the Patient Agreement. In this regard, the Court stated:

> Zoll argues that Plaintiffs cannot show reliance on the Marketing Statement because by signing the Patient Agreement, Anazco agreed to 'not rely on any verbal representations, promises, or assurances made by any ZOLL representative inconsistent with written materials provided by ZOLL concerning my use of LifeVest or my financial obligations.' (ECF No. 164-15 at 10). <u>But whether there is any inconsistency between the Marketing Statement and the written materials is disputed. In other words, a reasonable jury could conclude that the Marketing Statement and written materials both promised to deliver a shock if the wearer did not press the response buttons after it alarmed that a heart arrythmia was occurring.</u>

(*Id*. at 16 (emphasis added).)

Similarly, any question on the elements of intent and knowledge are for the jury to determine based on the circumstances of Zoll's representations, and would be improper for adjudication as a matter of law. *Cohen v. Kravit Estate Buyers, Inc.*, 843 So. 2d 989, 991 (Fla. 4th

DCA 2003) ("In fraud cases, summary judgment is rarely proper as the issue so frequently turns on the axis of the circumstances surrounding the complete transaction, including circumstantial evidence of intent and knowledge. . . . Fraudulent intent usually must be proved by circumstantial evidence and such circumstances may, by their number and joint consideration, be sufficient to constitute proof. A litigant has a right to trial where there is the slightest doubt as to the facts in a fraud case.") (quotation marks and citations omitted); *accord State Farm Mut. Auto. Ins. Co. v. Weiss*, 410 F. Supp. 2d 1146, 1159 (M.D. Fla. 2006) (collecting authorities for the proposition that "[g]enerally, the issue of fraud is not properly the subject of summary judgment, because a resolution of the issues involved requires an exploration of the relevant facts and circumstances, and thus a court can seldom determine the presence of fraud absent a trial or evidentiary hearing."); *Gov't Employees Ins. Co. v. DG Esthetic & Therapy Ctr., Inc.*, 2019 WL 1992930, at *9 (S.D. Fla. Apr. 19, 2019) (Altonaga, J.) (same).

Finally, with respect to Zoll's preemption argument regarding the claims premised on its representations via Ms. Diaz, it will be for the jury to assess whether what the FDA required and allowed Zoll to say to patients was exceeded. Indeed, as the Court has explained:

> Defendants argue that any claims based on representations derived from the Patient Manual are preempted because it is FDA approved. '[I]f any representations by the manufacturer imposed new requirements on its products, those requirements 'were undertaken by the manufacturer, not imposed by the state of Florida.'' *Godelia*, 881 F.3d at 1322 (quoting *Mink*, 860 F.3d at 1333). Here, <u>Plaintiffs have created a disputed issue of fact as to whether Defendants' representative, Ms. Diaz, made representations regarding the LifeVest that exceeded FDA requirements. Accordingly, Plaintiffs' representation claims are not preempted</u>. *See id.* (concluding that claims based on alleged misrepresentations of the LifeVest were not preempted because '[i]f Zoll' s various statements held its product out as meeting a higher standard than that required by the FDA, this was Zoll's independent undertaking').

(D.E. 247 at 19 (emphasis added).)

The foregoing reasoning was and remains correct. That is, as to any Zoll representation that <u>*deviates*</u> from what the FDA approved and required via the PMA process, the representation

is unapproved and does not carry *any* preemptive effect. The question is then whether the representation exceeds what the FDA approved and required, and that question is for the jury. *Id*.; *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1325 (11th Cir. 2017) (explaining federal preemption law, and noting that "after the FDA approves a device, the manufacturer may not make any change to the device's specifications, or anything else that might affect its safety and effectiveness, unless it submits a supplemental application to the FDA."); *accord Riegel*, 552 U.S. at 318-19 ("The premarket approval process includes review of the device's proposed labeling. The FDA evaluates safety and effectiveness under the conditions of use set forth on the label, and must determine that the proposed labeling is neither false nor misleading. . . . Once a device has received premarket approval, the MDA forbids the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness.") (citations omitted); 20 C.F.R. § 820.1(y) ("*Specification* means any requirement with which a product, process, service, or other activity **must** conform.") (emphasis added).

In sum, Plaintiffs' representations claims are for the jury to determine, and judgment as a matter of law is unwarranted.

### Conclusion

For all the foregoing reasons, Plaintiffs respectfully submit that Zoll's request for judgment as a matter of law should be denied, and the matter should be determined by the jury.

**HERNANDEZ LEE MARTINEZ, LLC**

Respectfully submitted,

**HERNANDEZ LEE MARTINEZ, LLC**
*Counsel for Plaintiffs*
28 West Flagler Street, Suite 600
Miami, Florida 33130
Phone: (305) 842-2100
Facsimile: (305) 842-2105

By:   s/  Jermaine A. Lee
   **Jermaine A. Lee, Esq.**
   Florida Bar No.: 0850861
   jlee@hlmlegal.com
   **Eric A. Hernandez, Esq.**
   Florida Bar No.: 340730
   eric@hlmlegal.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 8, 2023, I electronically filed the foregoing with the Clerk of the Court via CM/ECF. I also certify that the foregoing document is being served this day on all counsel or pro-se parties identified on the below service list, either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

   /s Jermaine A. Lee
   *Counsel for Plaintiffs*

Mark F. Raymond, Esq.
mark.raymond@nelsonmullins.com
stacy.smith@nelsonmullins.com
**NELSON MULLINS**
One Biscayne Tower, 21st Floor
2 S. Biscayne Blvd.
Miami, Florida 33131
Phone: (305) 373-9425
Fax: (305) 373-9443

Elizabeth Helm, Esq.
kate.helm@nelsonmullins.com
**NELSON MULLINS**
201 17th Street NW, Suite 1700
Atlanta, GA 30363
Phone: (404) 322-6429

Jenny A. Covington, Esq.
jenny.covington@nelsonmullins.com
Jenna L. Durr, Esq.
Jenna.durr@nelsonmullins.com
Allison.abbot@nelsonmullins.com
**NELSON MULLINS**
P.O. Box 26370
Minneapolis, MN 55426
Phone: (612) 464-7626